NICHOLAS KLIMENKO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Klimenko v. Commissioner
Docket No. 8193-91
United States Tax Court
T.C. Memo 1993-340; 1993 Tax Ct. Memo LEXIS 340; 66 T.C.M. (CCH) 287; August 2, 1993, Filed *340 Decision will be entered for petitioner. For petitioner: Woodford G. Rowland and Richard T. Franceschini. For respondent: Kathryn K. Vetter. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: By notice of deficiency dated February 7, 1991, respondent determined deficiencies in and additions to tax with respect to the Federal income taxes of Nicholas Klimenko and his former wife, Marina Klimenko (now known as Marina Bolshakoff), as follows: Additions to Tax Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1984
$ 34,295
$ 1,715
[1]
$  8,574
1985
42,014
2,101
[1]
10,504
The issues for decision are: (1) Whether Nicholas Klimenko (hereinafter petitioner) qualifies for innocent spouse relief pursuant to section 6013(e) with respect to the determined deficiencies and additions to tax; and (2) if petitioner is not entitled to innocent spouse relief, whether he is liable for the determined deficiencies and additions to tax. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice *341 and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and they are found accordingly. Background
Petitioner Nicholas Klimenko resided in San Anselmo, California, at the time he filed his petition in this case. Petitioner and his former wife, Marina Klimenko (hereinafter referred to as Mrs. Klimenko), timely filed joint Federal income tax returns for 1984 and 1985. [1]
Petitioner graduated from high school in 1962. After graduation, he served in the U.S. Army for 3 years and, in 1966, joined the San Francisco Police Department. At the time of trial, petitioner had been employed as a policeman with the San Francisco Police Department for over 26 years. He holds an associate of arts degree in police science from City College of San Francisco and is currently working towards a history degree at San Francisco State University. Mrs. Klimenko attended medical secretarial school. She was employed at various times during their *342 marriage except for periods when their children were very young. Mrs. Klimenko changed jobs often. During the 1970s, she changed jobs approximately once a year. Between 1976 and 1985, Mrs. Klimenko worked as a legal secretary at several law offices in the San Francisco area. The Klimenkos' Marriage
Petitioner and Mrs. Klimenko (hereinafter collectively referred to as the Klimenkos) were married in 1963 and remained married through the years in issue. They separated on or about January 1, 1986, and were divorced on October 23, 1986. The Klimenkos have two children, who were born in 1965 and 1967. The Klimenkos had each remarried before this case was tried. The Klimenkos had a tempestuous marriage. They frequently argued, most often about financial matters. They were separated for 4 months in 1971, but reconciled "for the children's sake". By 1983, petitioner was again considering divorce, but decided to wait until both of the children completed high school. (They graduated in 1983 and 1985.) The Klimenkos were, however, distant from each other during the period at the end of their marriage (including the years in issue). At that time, their marriage often involved *343 two people living separate lives under a single roof. Finances and Bank Accounts
During the years in issue, the Klimenkos set a budget for some of their expenses. They budgeted funds for their house payment, food, utilities, taxes, and insurance. They generally did not budget for clothing, furniture, or car payments. They also did not budget or limit Mrs. Klimenko's discretionary spending. The Klimenkos maintained a joint checking account at the Wells Fargo Bank. Petitioner paid family bills from this account, including their house payments and utility bills. Petitioner wrote most of the checks and reconciled this account. Both Mrs. Klimenko and petitioner deposited part of their paychecks into the Wells Fargo account. Mrs. Klimenko retained the remainder of her paychecks, and spent the retained amounts as she wished. During 1984 and 1985, petitioner also maintained an individual checking account at the Bank of America because he feared that Mrs. Klimenko would deplete the money in the Wells Fargo account. Petitioner transferred money from the Wells Fargo account into the Bank of America account in order to set funds aside for family expenses such as taxes, insurance, *344 and vacations. Petitioner also deposited a portion of his monthly paycheck into this account. Mrs. Klimenko did not contribute to the Bank of America account. Pension Buy-Out
In 1982, petitioner elected to take a pension buy-out from the city of San Francisco. He received approximately $ 29,000 from the buy-out. Petitioner opened IRA accounts for the Klimenkos with a portion of these funds. In addition, he transferred some of the pension buy-out funds to the Bank of America account, and used a portion of the pension buy-out funds to pay off a credit card bill for Mrs. Klimenko and for a 1985 family vacation. Mrs. Klimenko's Psychiatric History
Mrs. Klimenko has a history of recurrent cyclical depressions, and suffered from severe mood swings during the marriage. In 1979, she was diagnosed as suffering from manic depressive illness. She attempted suicide in that year, and was treated for depression on an inpatient basis. She saw a psychiatrist for approximately 6 months, and was prescribed drugs to keep calm. Mrs. Klimenko was rediagnosed in 1988 as suffering from bipolar affective disorder (previously known as manic depressive syndrome). Mrs. Klimenko also *345 has a history of alcohol abuse. She drank heavily during 1984 and 1985, the years in issue. Mrs. Klimenko's Shopping Sprees
Beginning in the early 1970s, Mrs. Klimenko purchased many household items and clothes impulsively and without petitioner's knowledge or consent. She opened charge accounts in his name without his knowledge. She became increasingly independent from petitioner, and they regularly argued about her behavior. Mrs. Klimenko's shopping sprees continued in the 1980s. She impulsively purchased a "relatively new" Datsun 280Z in 1980 and a new Oldsmobile in 1982 or 1983. She made both of these purchases without petitioner's knowledge or consent. When the Klimenkos argued about the purchases, Mrs. Klimenko's position was that she did not need petitioner's permission to buy anything because she was working, and had a right to decide how to spend her earnings. Mrs. Klimenko's shopping sprees continued throughout the 1980s. Mrs. Klimenko used credit cards for many of her purchases. In 1983, a bank representative visited the Klimenkos' home and asked her to surrender one of her credit cards because of limit violations. The Klimenkos' Houses
In late *346 1981, the Klimenkos purchased a house and moved to Petaluma, California. Without petitioner's agreement, Mrs. Klimenko hired a company to install an in-ground pool at the residence. Mrs. Klimenko forged petitioner's signature on the pool contract. Petitioner had to take out a $ 20,000 second mortgage to pay for the pool. In 1984, the Klimenkos moved from Petaluma to Novato, California. The Novato house was not significantly different from the Petaluma house. This move did, however, decrease petitioner's commute to work by 10 miles. Mrs. Klimenko's History of Embezzlement
Between 1976 and 1983, Mrs. Klimenko embezzled funds while working as a legal secretary for several San Francisco attorneys. The embezzled amounts ranged from $ 500 to $ 10,000 (per law firm). Mrs. Klimenko was prosecuted after one incident in 1976, and was later placed on probation. Petitioner became aware of some of these incidents when Mrs. Klimenko was caught by her employers. However, he only learned of other incidents long after they occurred, in some instances 10 years later. [2] Most of the law firms that caught Mrs. Klimenko agreed to punish her by requiring restitution. *347 Mrs. Klimenko's Embezzlement from Farella, Braun and Martel
Between December 1983 and June 1985, Mrs. Klimenko was employed as a legal secretary at Farella, Braun and Martel, a San Francisco law firm. She falsely stated on her Farella, Braun and Martel employment application that she had a business administration degree from Sonoma State University. Mrs. Klimenko served as Mr. John Martel's secretary at Farella, Braun and Martel. As part of her duties, Mrs. Klimenko maintained several of Mr. Martel's checking accounts. These accounts included four accounts at the California Canadian Bank (account numbers XXX6776, XXX8585, XXX7209, and XXX8308), and one account at the Hibernia Bank (account number XXXX9578). Mrs. Klimenko maintained the check registers and prepared checks for Mr. Martel's signature. She was not, however, an authorized signatory on his accounts. Mr. Martel would occasionally leave blank, signed checks for Mrs. Klimenko to use to pay his bills when he was out of town. Mrs. Klimenko embezzled money from the checking accounts that Mr. Martel left in her charge. She forged his signature on checks and prepared and negotiated unauthorized checks. Many of *348 the unauthorized checks were written to cash or to "Marina Klimenko". Mrs. Klimenko personally endorsed some of the checks that were written to cash. Mr. Martel did not discover Mrs. Klimenko's embezzlement until late 1986 (after she had left the firm), when his new secretary attempted to reconcile his accounts. At the time, Mr. Martel estimated that Mrs. Klimenko's embezzlement totaled approximately $ 240,000. Petitioner did not know of, and was not involved in any way in, his wife's embezzlement. Mr. Martel reported the thefts to the San Francisco District Attorney's Office in January 1987. On February 10, 1987, an investigator with the San Francisco District Attorney's Office contacted petitioner. The investigator informed petitioner that he was investigating an allegation that Mrs. Klimenko embezzled funds from Mr. Martel. This was the first time that petitioner heard of Mrs. Klimenko's embezzlement from Mr. Martel. On July 8, 1987, Mr. Martel sent a "victim notification" form to Mrs. Klimenko's probation officer. Mr. Martel made the following statement on this form: "Marina [Klimenko] is incapable of telling of the truth; moreover, she has an unexcelled ability to create *349 an impression of sincerity, hiding behind real and imagined physical disabilities and readily accessed tears * * *. Put simply, she thinks she can get away with anything and so far has done just that." Mrs. Klimenko was arraigned on criminal charges and eventually pled guilty to grand theft and excessive taking of funds in May 1988. [3] She was sentenced and served 12 months in the San Francisco County Jail. Mrs. Klimenko's Disposition of the Funds Embezzled From Mr. Martel
The following list summarizes some of the purchases and other dispositions that Mrs. Klimenko made with the funds that she embezzled from Mr. Martel. a. Bank Account Deposits
Mrs. Klimenko opened the following bank accounts with *350 funds that she embezzled from Mr. Martel: 1. On February 12, 1985, she opened an account in her name at California Federal Savings (account number XX-X028-9). At this time, she deposited a $ 60,000 check into the account. The check was payable to "Marina Klimenko", and was from Mr. Martel's checking account number XXX6776. 2. On February 28, 1985, Mrs. Klimenko opened another account in her name at California Federal Savings (account number XX-XX-X583-0). At that time, she deposited a $ 15,000 check into the account. The check was payable to Mrs. Klimenko, and was from Mr. Martel's checking account number XXX6776. Subsequently, she deposited a $ 10,000 check into this account. The check was dated March 20, 1985, and was written to Mrs. Klimenko from Mr. Martel's checking account number XXXX9578. 3. On April 16, 1985, Mrs. Klimenko opened a Homestead Savings account. The account was in both her and petitioner's name. Petitioner, however, had no knowledge of the account until he prepared the Klimenkos' 1985 Federal income tax return. Only Mrs. Klimenko made deposits and withdrawals and wrote checks on the account. She deposited the following amounts into the Homestead *351 Savings account: Date
Amount
Source
4/16/85
$ 50,000.00
California Federal Savings
4/25/85
10,000.00
Mr. Martel's checking accounts
4/29/85
6,000.00
Mr. Martel's checking accounts
5/16/85
9,040.44
Mr. Martel's checking accounts
b. Checks Written From Mr. Martel's Accounts
Mrs. Klimenko wrote the following checks to herself from Mr. Martel's checking accounts: From Account No. XXX8308
Check No.
Date
Amount
3519
2/22/84
$   723.00
3742
9/8/84 975.00
3782
9/28/84
878.96
3780
10/11/84
900.00
3762
10/26/84
878.96
3862
12/25/84
1,800.00
From Account No. XXX8585
Check No.
Date
Amount
1822
8/2/84
$ 2,750.00
1837
8/28/84
1,350.00
1897
10/24/84
872.36
1919
11/12/84
1,250.00
1945
12/5/84
1,450.00
Mrs. Klimenko wrote the following checks to cash from Mr. Martel's checking accounts: From Account No. XXX8308
Dates
Number of Checks
Total Value of Cashed Checks
Between 1/9/84
47
$ 46,285
and 4/15/85
From Account No. XXX8585
Dates
Number of Checks
Total Value of Cashed Checks
Between 3/3/84
9
$ 7,800
and 11/19/84
Mrs. Klimenko personally endorsed many of these checks. *352 c. Restitution to Prior Employer
Mrs. Klimenko used Mr. Martel's funds to repay debts caused by her past embezzlement. In May and July of 1984, she purchased two cashier's checks totaling $ 10,342.10 with checks written from Mr. Martel's checking account number XXX8308. She used this money as restitution for embezzled funds from Lillick, McHose & Charles, a San Francisco law firm where she was employed during 1983. In a letter enclosed with the first check, Mrs. Klimenko falsely stated that she had put her house up for sale in order to help repay the law firm. d. Loan Repayments
1. Mrs. Klimenko took out a loan from the San Francisco Police Credit Union in the early 1980s. Petitioner did not know about the loan when it was made, and only learned of it at a later date when a loan statement was delivered to the Klimenkos' house. Petitioner did not monitor the loan and never knew the amount of the outstanding balance. On January 9, 1984, Mrs. Klimenko wrote a $ 3,725.95 check from Mr. Martel's checking account number XXX8308 to the San Francisco Police Credit Union to pay off all or a portion of a loan. 2. On February 2, 1984, Mrs. Klimenko wrote a $ 5,519.08 check *353 from Mr. Martel's checking account number XXX8308 to General Motors Acceptance Corporation. This check satisfied the balance of a debt that had been incurred when Mrs. Klimenko purchased an Oldsmobile in the early 1980s. e. Retail Purchases
During 1984 and 1985, Mrs. Klimenko had a charge account at Mervyn's department store. She used funds from Mr. Martel's accounts to pay for her Mervyn's purchases. She wrote a total of six checks from two of Mr. Martel's checking accounts (numbers XXX8585 and XXX8308), for a total amount of $ 5,564.40. Mrs. Klimenko also had an individual charge account at Breuners furniture store chain. She purchased dining room furniture from Breuners without petitioner's knowledge or agreement. On July 31, 1984, she purchased a $ 2,515.05 cashier's check, payable to Breuners, with a check from Mr. Martel's checking account number XXX8308. She wrote three additional checks to Breuners for a total of $ 6,902.16 from two of Mr. Martel's checking accounts (numbers XXX8585 and XXX8308). Mrs. Klimenko also used Mr. Martel's funds to pay her Macy's department store charge account. On August 16, 1984, and December 12, 1984, Mrs. Klimenko wrote checks *354 on Mr. Martel's accounts to purchase cashier's checks payable to Macy's in the respective amounts of $ 609.50 and $ 5,587.50. f. Automobile Purchases
On or about April 13, 1984, Mrs. Klimenko purchased a $ 15,545.64 Mercury Cougar with funds from Mr. Martel's checking accounts. She made this purchase without petitioner's knowledge. In fact, Mrs. Klimenko forged petitioner's signature on the purchase contract. Petitioner only learned about the Cougar when Mrs. Klimenko brought the car home. At the time, petitioner assumed that his wife had taken out a loan in order to finance the car. On January 3, 1985, Mrs. Klimenko purchased a used Mercury Topaz from a coworker for $ 6,000. She did not consult with petitioner before the purchase. Mrs. Klimenko paid for the Topaz with funds from Mr. Martel's checking account number XXX6776. Petitioner did not regularly drive the Cougar or the Topaz. He only drove these cars on several occasions when the Klimenkos went together to social events. One of the Klimenkos' sons drove the Topaz. g. Home Improvements
In 1984, Mrs. Klimenko installed new wall-to-wall carpeting in the Klimenkos' Petaluma residence. She paid $ 6,653.83 *355 for the carpeting, and used two checks written on Mr. Martel's checking account number XXX8585 for the purchase. This new carpet replaced carpet that was virtually brand new. Mrs. Klimenko also installed new carpeting in the Novato residence. On June 4, 1985, she paid for this carpeting with a $ 3,589 check from her California Federal Savings account. This account was funded with money that Mrs. Klimenko embezzled from Mr. Martel. Petitioner's Lack of Knowledge About Mrs. Klimenko's Embezzlement
Petitioner was unaware of Mrs. Klimenko's embezzlement from Mr. Martel during the years in issue. He was also unaware of her embezzlement when he completed the Klimenkos' joint 1984 and 1985 Federal income tax returns. Furthermore, petitioner did not know about the California Federal Savings accounts where Mrs. Klimenko deposited moneys that she embezzled from Mr. Martel. With regard to the Homestead account, petitioner only became aware of the account when he prepared the Klimenkos' 1985 Federal income tax return. He did not write any checks on, make any deposits into, or withdraw any funds from, the Homestead account. Neither was petitioner aware of the checks that Mrs. *356 Klimenko wrote to herself or to cash from Mr. Martel's checking accounts. Petitioner also had no knowledge during the years in issue of Mrs. Klimenko's past embezzlement from Lillick, McHose & Charles. He first learned of the Lillick, McHose & Charles embezzlement when preparing for the trial of this case. Petitioner was also not aware that Mrs. Klimenko used a portion of Mr. Martel's embezzled funds to repay the debt caused by her past embezzlement from Lillick, McHose & Charles. Petitioner was generally surprised and upset at Mrs. Klimenko's purchases. She did not consult with him before making purchases or incurring debts. Furthermore, whenever he confronted her about the purchases she became emotional and responded that she did not need his permission to buy anything and that her purchases were none of his business. Her outbreaks became more severe over time. Eventually, petitioner felt helpless to address the situation, withdrew from Mrs. Klimenko, and became reluctant to confront her. He assumed that she was financing her monthly payments for her purchases with the amounts that she retained from her paycheck. Petitioner was not aware of the extent of Mrs. Klimenko's *357 debts, and her shopping sprees during the years in issue appeared to him to be no different than her prior years' shopping sprees. Alleged Life Insurance Proceeds
In the spring of 1985, at the time when the Klimenkos were considering moving to Novato, Mrs. Klimenko informed petitioner that she had received money from her father's life insurance policy. (Mrs. Klimenko's father died on September 3, 1984.) She did not tell petitioner the exact amount. Mrs. Klimenko then agreed to contribute $ 60,000 of the insurance proceeds toward the purchase of the Novato residence. Petitioner was unaware of any insurance funds prior to this discussion. However, he believed that his wife had indeed received more than $ 60,000 from an insurance policy on her father because it was routine for Mrs. Klimenko to withhold financial information from him. On February 6, 1987, Mrs. Klimenko told the San Francisco district attorney investigator that $ 20,000 of the total amount used to purchase the Novato house was derived from her father's life insurance proceeds. She also told the investigator that she used an additional $ 20,000 of the insurance proceeds to renovate the house. In fact, Mrs. *358 Klimenko never received any proceeds from a life insurance policy on her father. The money that she claimed to have received from the policy had been embezzled from Mr. Martel. Restitution
Mrs. Klimenko made restitution of some of the embezzled funds to Mr. Martel and his insurance company. All of this repayment occurred after the years in issue. Property Settlement
Upon the dissolution of their marriage, petitioner and Mrs. Klimenko executed a marital settlement agreement. Pursuant to the agreement, petitioner received the Honda Civic, [4] all pension and retirement benefits attributable to his San Francisco Police Department employment, and a $ 27,725 equalizing payment for the Novato house. Mrs. Klimenko received the Novato house (subject to the equalizing payment to petitioner), the home furniture, the Topaz, the Oldsmobile, and the Cougar. The Klimenkos' 1984 and 1985 Federal Income Tax Returns
The Klimenkos did not report *359 Mrs. Klimenko's embezzled income on their 1984 and 1985 joint Federal income tax returns. In the notice of deficiency, respondent determined that the Klimenkos had unreported embezzlement income of $ 82,423 and $ 100,040 for 1984 and 1985, respectively. Petitioner was already separated from Mrs. Klimenko when he prepared the Klimenkos' 1985 Federal income tax return. In preparing this return, petitioner asked Mrs. Klimenko about interest income, and she stated that there was none. However, when petitioner reminded Mrs. Klimenko about her father's insurance policy proceeds (which she had told him that she kept in a bank account), she produced several Forms 1099 that stated interest income. Petitioner believed that he correctly reported all of the Klimenkos' income on their 1984 and 1985 joint Federal income tax returns, and Mrs. Klimenko did not provide him any reason to believe otherwise. The Klimenkos reported the following wage and interest income on their 1984 and 1985 joint Federal income tax returns: 1984
1985
Petitioner's Wages
$ 37,025.40
$ 37,748.20
Mrs. Klimenko's Wages
23,609.24
25,645.38
Interest
648.00
2,248.00
OPINION The first issue is whether *360 petitioner qualifies for "innocent spouse" relief pursuant to section 6013(e) with respect to the 1984 and 1985 deficiencies and additions to tax. Petitioner claims that he is entitled to this relief. Respondent disagrees. Section 6013(d)(3) states the general rule that a husband and wife who file a joint return are jointly and severally liable. However, under section 6013(e), a spouse is relieved of liability if he or she proves: (1) That a joint return was made for a particular taxable year; (2) that there was a substantial understatement of tax on the joint return; (3) that the understatement exceeds a certain percentage of the preadjustment year income of the spouse seeking relief; (4) that the substantial understatement is attributable to grossly erroneous items of the other spouse; (5) that the spouse seeking relief did not know, and had no reason to know, of the substantial understatement when he or she signed the return; and (6) that, after consideration of all the facts and circumstances, it would be inequitable to hold him or her liable for the deficiency attributable to the substantial understatement. Estate of Simmons v. Commissioner, 94 T.C. 682, 683 (1990); *361 Purcell v. Commissioner, 86 T.C. 228, 234-235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). The spouse seeking relief bears the burden of proving that each of the section 6013(e) requirements is satisfied. Purcell v. Commissioner, 826 F.2d at 473. As a result, a failure to meet any of the statutory requirements will disqualify an individual from innocent spouse relief. Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). In the case before us, the parties agree that several of the section 6013(e) requirements are satisfied for 1984 and 1985. Specifically, the following are undisputed: That joint Federal income tax returns were filed; that there were substantial understatements of tax on the returns; that the understatements exceed the statutorily required percentage of petitioner's preadjustment year income; and that the substantial understatements of tax are attributable to grossly erroneous items on the part of Mrs. Klimenko. As a result, we focus only on: (1) Whether petitioner did not know, and *362 had no reason to know, of the substantial understatements when he signed the 1984 and 1985 Federal income tax returns; and (2) whether it would be inequitable to hold petitioner liable for the income tax deficiencies and additions to tax attributable to the substantial understatements. (1) Petitioner's Knowledge of the Substantial Understatements
Section 6013(e)(1)(C) requires petitioner to prove that he did not know, and had no reason to know, of the substantial understatements when he signed the Klimenkos' 1984 and 1985 joint returns. In determining whether a taxpayer had "reason to know" of the substantial understatements, we consider whether the spouse would have reason to know of the transaction that gave rise to the substantial understatement. Bokum v. Commissioner, supra at 153 (quoting Purcell v. Commissioner, 826 F.2d at 474); McCoy v. Commissioner, 57 T.C. 732 (1972); see also Quinn v. Commissioner, 524 F.2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974). Courts have consistently applied this approach to *363 income omission cases. [5]Mere ignorance of the tax consequences of an income omission is by itself insufficient to establish that a spouse did not have reason to know of a substantial understatement. See Stevens v. Commissioner, 872 F.2d 1499, 1505 n.8 (11th Cir. 1989), affg. T.C. Memo. 1988-63. *364 Based on the record before us, we are persuaded that petitioner did not know of the substantial understatements when he prepared and signed the Klimenkos' 1984 and 1985 returns. At that time, petitioner was unaware that Mrs. Klimenko had embezzled funds from Mr. Martel. We found petitioner to be a credible witness. He testified that he did not learn of his wife's embezzlement from Mr. Martel until his February 10, 1987, meeting with the San Francisco district attorney investigator. This meeting occurred a year after petitioner signed the 1985 Federal income tax return and 2 years after he signed the 1984 return. Mrs. Klimenko corroborated petitioner's statement by testifying that she never told him about the embezzlement. We conclude that petitioner did not know of the embezzlement income that was omitted from the Klimenkos' 1984 and 1985 joint Federal income tax returns. Remaining for determination is whether petitioner had "reason to know" of the omitted income on the 1984 and 1985 returns. Whether a putative innocent spouse had reason to know of a substantial understatement is a question of fact that must be determined based upon the entire record. Guth v. Commissioner, 897 F.2d 441 (9th Cir. 1990), *365 affg. T.C. Memo. 1987-522. The applicable standard is whether "a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." Stevens v. Commissioner, supra at 1505; see also Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), revg. an Oral Opinion of this Court. This standard applies to omitted income as well as erroneous deduction cases. Stevens v. Commissioner, supra at 1505 n.8. The Court of Appeals for the Ninth Circuit has outlined the following factors to be considered when deciding whether an alleged innocent spouse had reason to know of a substantial understatement: (a) The spouse's level of education; (b) the spouse's involvement in the family's business and financial affairs; (c) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (d) the culpable spouse's evasiveness and deceit *366 concerning the couple's finances. Price v. Commissioner, supra. We hereinafter apply each of these factors to the petitioner in this case. (a) Petitioner's Level of Education
At the time he signed the returns, petitioner had an associate of arts degree in police science from City College of San Francisco. He had also taken some additional college classes, though none were business related. During the years in issue, petitioner had been a police officer with the San Francisco Police Department for some 18-19 years. (b) Petitioner's Involvement in the Family's Business Affairs
Petitioner was involved in the Klimenkos' routine business and financial affairs. He maintained their Wells Fargo joint checking account, which was used to pay the family expenses. He also kept a separate individual bank account in which he set aside additional funds for family expenses. Mrs. Klimenko was, however, independent with regard to her financial affairs. While she deposited portions of her paychecks into the Wells Fargo account, she used the remainder of her paychecks as she saw fit, and without petitioner's knowledge or consent. Furthermore, *367 Mrs. Klimenko deposited and disposed of her embezzled funds without petitioner's knowledge. She was very secretive and deceitful regarding her income. Petitioner prepared the Klimenkos' 1984 and 1985 Federal income tax returns. At the time he prepared them, petitioner believed that all of the Klimenkos' income was properly reported on the returns. (c) Lavish or Unusual Expenditures
Beginning in the early 1970s and continuing through the years in issue, Mrs. Klimenko began purchasing household items without petitioner's knowledge or acquiescence. This behavior continued throughout their marriage, including the years in issue. Mrs. Klimenko purchased various items, including furniture and cars. Petitioner testified that when he confronted Mrs. Klimenko about the purchases, she became emotional and told him that she worked and could do whatever she pleased with her earnings. He assumed that she made the purchases on credit, making monthly payments from the money that she withheld from her paychecks. Mrs. Klimenko's spending sprees during the years in issue mirrored her behavior in previous years. Petitioner testified that, by 1985, he could simply no longer continue *368 to confront Mrs. Klimenko because of her emotional outbreaks. In light of Mrs. Klimenko's pattern of behavior, her 1984 and 1985 expenditures were neither lavish nor unusual. We note that while petitioner was aware of some of his wife's past embezzlement incidents, he received no indications that she was in the process of embezzling over $ 180,000 during 1984 and 1985. [6] Mrs. Klimenko did not make any large or unusual purchases, or do anything else that might have put petitioner on notice that she was embezzling such a large sum. We disagree with respondent's contention that Dickey v. Commissioner, T.C. Memo. 1985-478, is similar to the case at bar. The facts of the two cases are distinguishable.
The Klimenkos' *369 move to the Novato house was not lavish or unusual. They had moved several times during the early 1980s and, while a portion of the down payment on the Novato house came from embezzled funds, petitioner believed Mrs. Klimenko's story that the money came from her father's life insurance policy. This was a reasonable belief in light of the fact that Mrs. Klimenko's father had passed away 9 months earlier. Petitioner similarly assumed that Mrs. Klimenko was paying for the improvements to the house with insurance money. He believed that she received more than the $ 60,000 in total from the life insurance policy, but that she intentionally concealed the exact amount of the insurance proceeds. We note that the district attorney investigator's report corroborates petitioner's testimony that Mrs. Klimenko stated that the funds that she used for the Novato house came from her father's life insurance policy. In sum, the Klimenkos' expenditures during 1984 and 1985 were neither lavish nor unusual in light of their previously established pattern of behavior. Their lifestyle during the years in issue was consistent with their lifestyle prior to the years in issue. Their expenditures were *370 not of a nature to indicate to petitioner that Mrs. Klimenko was receiving money from an unknown source. (d) Mrs. Klimenko's Evasiveness and Deceit
Mrs. Klimenko was secretive, evasive, and deceitful toward petitioner regarding both her finances and spending. When petitioner confronted her about the purchases, she responded with emotional outbursts. Eventually, these outbursts caused petitioner to avoid confrontations with his wife. We conclude from the above factors that petitioner did not have reason to know of Mrs. Klimenko's embezzlement from Mr. Martel during 1984 and 1985. While petitioner is a well-educated individual, this factor is outweighed by the particular circumstances of his marriage. Further, in applying the above-stated standard of a reasonable person in a like position, we have also taken into account Mrs. Klimenko's manic depressive disorder. This disorder was discussed by petitioner's expert witness. Petitioner's Expert Witness
Petitioner called Bruce Scott Victor, M.D., a psychiatrist who specializes in the diagnosis and treatment of mood disorders, as an expert witness at trial. Dr. Victor received an M.D. in 1980 from the University of *371 Michigan, and was a resident in psychiatry at the University of California in San Francisco between 1980 and 1984. As of the date of trial, he held the following positions: director of clinical psychopharmacology in the Department of Psychiatry at the California Pacific Medical Center; expert consultant and core faculty member of the Mood and Anxiety Disorders Clinic in the Department of Psychiatry at the California Pacific Medical Center; and expert consultant with the Medical Board of California. Dr. Victor testified with regard to the general conditions, symptoms, and behavior of patients with bipolar disorder. He also examined Mrs. Klimenko's medical reports contained in the record and testified as to his view of Mrs. Klimenko's disorder based on these reports and his own medical knowledge. At trial, Dr. Victor confirmed that Mrs. Klimenko has a bipolar affective disorder. He explained that bipolar affective disorder is a disregulation of moods that results in mood swings. The mood swings range from very "high" periods, characterized by increased energy, impulsivity, grandiosity, and declining ability to make good judgments, to periods of severe depression. Dr. Victor stated *372 that many of Mrs. Klimenko's characteristics are common symptoms of bipolar disorder and strongly suggest manic depressive illness. Financial indiscretions, such as Mrs. Klimenko's embezzlements, are very common in manic depressive illness, and often take the form of spending sprees. Hysterical outbursts, suicide attempts, and deceitful behavior are further characteristics of the disease. Dr. Victor also testified about the general effect that manic depressive patients have on their families. He testified that denial was a common reaction for family members of manic depressive patients. Another frequent response is to withdraw from and avoid the patient. Family members avoid intimate interactions in order to escape negative reactions such as verbal outbursts, castigation, and impulsive behavior. In other words, family members become reluctant to confront manic depressives. In addition, family members feel pain, anguish, disappointment, and a subjective sense of helplessness because any intervention appears to be useless in altering the manic depressive behavior. We accept Dr. Victor's testimony and analysis. It is clear that Mrs. Klimenko's behavior during the years in issue *373 was that of an individual with a bipolar affective disorder. She was involved in secret financial indiscretions. She was deceitful and often lost self-control when petitioner confronted her about her purchases. After each confrontation, petitioner felt helpless over the situation. Mrs. Klimenko's behavior became so severe that petitioner withdrew from her and avoided confrontations. It is clear that Mrs. Klimenko's bipolar disorder was another barrier to petitioner's having reason to know of her embezzlement from Mr. Martel. Petitioner's responses to his wife's manic depressive behavior during 1984 and 1985 were common for a spouse in that position. We conclude that petitioner did not have reason to know of Mrs. Klimenko's embezzlement from Mr. Martel. Further, we conclude that a reasonable, prudent person in petitioner's position would not have known of the omitted income when he prepared the Klimenkos' 1984 and 1985 Federal income tax returns. Thus, petitioner has satisfied the section 6013(e)(1)(C) requirement. (2) The Inequity of Holding Petitioner Liable
Remaining for decision is whether it would be inequitable to hold petitioner liable for the deficiencies and *374 additions to tax in issue. Section 6013(e)(1)(D) requires that we consider all of the facts and circumstances when making this determination. Whether a spouse significantly benefited from the erroneous items is an important factor in determining whether it is inequitable to hold a spouse liable. Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987). "Normal support" is not considered a significant benefit. Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). Normal support is a floating standard, inasmuch as "one person's luxury can be another's necessity". Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975). Petitioner bears the burden of proving that he received no significant benefit from the understatements other than normal support, and this burden must be satisfied with specific facts regarding lifestyle, expenditures, asset acquisitions, and the disposition of the benefits of the understatements. See Estate of Krock v. Commissioner, 93 T.C. 672 (1989). We are persuaded that petitioner *375 did not significantly benefit from Mrs. Klimenko's 1984 and 1985 embezzlement income. Most notably, he received little benefit from the purchases that Mrs. Klimenko made with the embezzled funds. He did not drive either of the cars that she purchased, except for a few occasions when they went together to social events. As to the household furnishings, petitioner testified that he felt that the Klimenkos' existing furniture was more than adequate, and that he received no enjoyment from the new furniture. Further, he did not receive any significant gifts from his wife during this period. In fact, petitioner testified that he was very upset by the purchases and worried about how Mrs. Klimenko would pay for them. Petitioner also did not receive any significant benefits from the Novato house. While he lived in the house for 8 months, the Novato house was not significantly different from the Petaluma house. The sole benefit petitioner received from the Novato house was that his commute to work was 10 miles shorter. We believe that the convenience of this shorter commute was more than outweighed by the discomfort that petitioner experienced with his wife's purchases. The Klimenkos' *376 marital settlement agreement also did not provide petitioner with any benefit from the items that Mrs. Klimenko purchased with her embezzled funds. As a result of the agreement, Mrs. Klimenko received the Novato house, while petitioner received a $ 27,725 equalizing payment. Mrs. Klimenko received the Cougar, the Topaz, and the Oldsmobile, while petitioner received the Honda Civic. Mrs. Klimenko also received all of the household furniture and furnishings. Petitioner received full rights to his pension benefits. In sum, there is no clear evidence to suggest that petitioner received any "significant benefit" from his wife's 1984 and 1985 embezzled income. We conclude that there was no unusual support or transfers of property to petitioner that would constitute a significant benefit. Furthermore, having considered all of the remaining facts and circumstances of this case, we hold that it would be inequitable to hold petitioner liable for the deficiencies and additions to tax in issue. As discussed above, petitioner was in an unfortunate situation that was beyond his control. He is entitled to relief. We hold the section 6013(e)(1)(D) requirement to be satisfied in this case. *377 (3) Conclusion
Petitioner has satisfied all the section 6013 (e) requirements, and, as a result, qualifies for innocent spouse relief for 1984 and 1985. In light of this holding, it is unnecessary to decide whether petitioner is liable for the determined deficiencies and additions to tax. To reflect the foregoing, Decision will be entered for petitioner. Footnotes
1. 50 percent of the interest due on the deficiencies.↩
1. We note that Mrs. Klimenko did not file a Tax Court petition.↩
2. Petitioner first learned of some of the embezzlement incidents only when he was preparing for the trial of this case.↩
3. We note that no accusations were brought against petitioner with regard to any of Mrs. Klimenko's embezzlements, including the thefts from Mr. Martel. In addition, no disciplinary proceedings were brought by the San Francisco Police Department against petitioner as a result of Mrs. Klimenko's actions.↩
4. Petitioner had purchased the Honda Civic new in May 1980.↩
5. There is a disagreement between this Court and several Courts of Appeals, including the Ninth Circuit (the Court of Appeals to which this case is appealable), with regard to the proper standard to be applied to erroneous deduction cases. See Price v. Commissioner, 887 F.2d 959, 963-964 n.9 (9th Cir. 1989), revg. an Oral Opinion of this Court; Bokum v. Commissioner, 94 T.C. 126, 148-157 (1990), affd. on other grounds 94 F.2d 1132 (11th Cir. 1993); Park v. Commissioner, T.C. Memo. 1993-252. However, this disagreement does not affect our analysis of the present case because this case involves deficiencies attributable to omissions of income, not erroneous deductions. See also Guth v. Commissioner, 897 F.2d 441, 444 (9th Cir. 1990), affg. T.C. Memo. 1987-522↩ (distinguishing income omission and erroneous deduction cases).
6. We emphasize that petitioner was not aware of the full extent of Mrs. Klimenko's past embezzlement, and as to those incidents of which petitioner was aware, such incidents involved sums of money substantially less than the amounts Mrs. Klimenko embezzled from Mr. Martel.↩